**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FREDERIC PESCE, individually, and derivatively on behalf of VERTIGO MEDIA GROUP INC., | Civil Action No.: 25-cv-6323 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| LISA MIRABILE and VERTIGO MARKETING GROUP LLC, | **WITH JURY DEMAND** |
| Defendants, | |
| VERTIGO MEDIA GROUP INC., | |
| Nominal Defendant. | |

Plaintiff, Frederic Pesce ("Pesce" or "Plaintiff"), alleges in this Complaint ("Complaint"), individually on behalf of himself, and derivatively, on behalf of Vertigo Media Group Inc. ("Vertigo Media" or the "Company"), as follows:

## INTRODUCTION

1.      This case arises from Defendant Lisa Mirabile's wrongful exclusion and suppression of Pesce from Vertigo Media Group Inc. ("Vertigo Media" or the "Company"), the marketing company he co-founded with her, and her diversion of Vertigo Media's clients, business, and goodwill to a company she controls, Vertigo Marketing Group LLC ("Vertigo Marketing"). Through a pattern of self-dealing and misappropriation, Mirabile steered Vertigo Media's clients (which Pesce co-developed and serviced) to her new company, while freezing him out of their business and saddling him with its debts. Brazenly, she named her new company "Vertigo Marketing Group," and even referred to it by Vertigo Media's old nicknames, "VMG" and "Vertigo," to dupe Vertigo Media Group's clients, falsely holding her new firm out as a mere

"rebrand" of Vertigo Media.  Mirabile and her company are now profiteering off Pesce's work and the Vertigo brand that he built and co-managed for the last two decades.

2.    By her breaches of fiduciary duty, diversion of corporate opportunities and other acts, Mirabile has inflicted direct harm upon Pesce — depriving him of compensation, clients, and company distributions.  Mirabile has also caused substantial harm to Vertigo Media, by misleading and misappropriating its clients, trading off its name and goodwill, and taking its accounts, all in violation of New York and federal law.  Accordingly, Plaintiff Pesce asserts claims individually, for the direct damages he suffered, and derivatively, on behalf of Vertigo Media for the damages Defendants caused to the corporation.  Pesce seeks both legal and equitable relief, to restore the value of the business that Defendants destroyed, and in response to Defendants' willful and maliciously deceptive conduct, he seeks treble damages and attorneys' fees, as provided by law.

## PARTIES

3.    Plaintiff Pesce is an individual residing in Suffolk County, New York who owns forty percent (40%) of the shares of nominal defendant, Vertigo Media Group Inc.

4.    Upon information and belief, Defendant Mirabile is an individual residing at Port Jefferson Station, Suffolk County, New York, who owns sixty percent (60%) of the shares of Vertigo Media Group, Inc., and is now exercising complete control over the company's business, operations and finances.

5.    Upon information and belief, Defendant Vertigo Marketing Group LLC is a corporation formed under New York law with its principal address in Patchogue, Suffolk County, New York, which is solely owned and controlled by Defendant Mirabile.

6.      Nominal Defendant Vertigo Media Group Inc. is a corporation formed under New York law with its principal address previously located in Bohemia, Suffolk County, New York, and its registered agent located at 191 Walker Street, West Babylon, Suffolk County, New York.

## JURISDICTION AND VENUE

7.      This is a civil action brought under the Lanham Act of the United States, 15 U.S.C. §§ 1051 *et seq.*, subject matter jurisdiction being conferred by 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  Plaintiff's common law claims, and state statutory claims are joined and related pursuant to 28 U.S.C. §§ 1367(a) and 1338(b).

8.      Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(c), as Defendants Mirabile and Vertigo Marketing Group are residents of Suffolk County, New York and subject to personal jurisdiction in this Judicial District, Defendants conduct business in this Judicial District, and Defendants' wrongful acts, including false designation of origin, breach of fiduciary duty, usurpation of corporate opportunities, and unfair competition, have taken place and are continuing to take place in this Judicial District, thereby causing harm to Plaintiff in this Judicial District.

## FACTS

### Vertigo Media's Founding and Growth

9.      In 2004, Mirabile started a boutique marketing and creative agency under the name "Vertigo New York, Inc."  Shortly thereafter, Pesce joined Mirabile at Vertigo New York, Inc., and in 2006, they reorganized the company and subsequently created a new entity to conduct the business which they named "Vertigo Media Group, Inc." To clients and others, they publicly referred to the Company as "VMG" or "Vertigo."

10.     For nearly two decades, Pesce and Mirabile ran Vertigo Media, with Mirabile holding 60% ownership and Pesce holding 40%, and both serving as officers and directors of the company — Mirabile as President and Pesce as Executive Vice President and Creative Director. In their roles, Pesce designed client campaigns, led production, and co-managed operations, while Mirabile managed firm administration, finances, and client communications.

11.     The two owners shared the profits and growth of their company, generally in accordance with their ownership percentages, with Mirabile always taking sixty percent and Pesce generally taking about forty percent, via bi-weekly payments from Vertigo Media's account to their individual bank accounts, and occasional small bonus payments to each.

12.     Pesce was directly involved in shaping Vertigo Media's creative output, client campaigns, and business growth.  While Mirabile handled most client-facing communication, Pesce managed or co-managed the creative execution, production systems, deliverables and strategic direction for nearly every major account.  Pesce was centrally involved in all major business decisions for Vertigo Media — for example, assuming personal financial liability for the company's 2011 acquisition of the web/digital design firm Digital Motion Web.

13.     Pesce's contributions were central to Vertigo Media's growth and success.  His creative leadership, technical expertise, and strategic input were indispensable to Vertigo's success and acquisition of client accounts. Among his major contributions, Pesce designed and developed client logos, websites, advertising materials, and campaigns that defined Vertigo Media's public identity and won many of its clients.  He led creative campaigns that built the agency's reputation, and his work defined the company's portfolio for nearly two decades.

14.     In addition, Pesce managed most of the creative and technical aspects of Vertigo Media's podcast studio.  He handled, among other things, the filming, recording, editing,

scheduling, and the development of announcements for the podcasts, as well as the uploading and distribution of podcasts on platforms, including YouTube and social media, thereby developing and creating media capability and revenue stream.

15.     Over twenty years, Pesce was centrally responsible for developing and servicing Vertigo Media's key lucrative clients, including:

a.     *Merola Tile:* For this international tile distributor and original client since 2005, Pesce created the logo and brand identity, designed its websites, marketing materials and presentations, directed marketing photo and video shoots, managed firm creative teams, and handled all production logistics.

b.     *Gerwin Healthcare:* For this major client, Pesce was essential in producing all the creative materials, including PowerPoint, videos, and a custom webpage which were integral to the Company's proposal and pitch, and he thereby served a crucial role in securing the account.

c.     *Fatfish on the Water:* Pesce designed and built the restaurant's website and marketing collateral, was centrally involved in client meetings, directed photo shoots, and managed client account creative needs and output, delivering a full suite of digital and print assets for the client.

d.     *The Advance Group:* Pesce oversaw the branding, campaign design, and creative direction for this logistics company.

e.     *PW Grosser Consulting:* Pesce created the logo, branding, and website design for this engineering/environmental firm, ensuring branding consistency across all marketing assets and producing its podcast.

     f.    *Bristol Pay/Get Payably:* Pesce was responsible for the branding, design, website structure and marketing collateral created for this Vertigo Media client, designing digital and print assets and managing Vertigo Media's creative direction across all channels.

     g.    *ADR Law:* After originating the client, Pesce oversaw its marketing campaign.

     h.    *Lamb & Barnosky LLP*: After originating the client, Pesce handled the creative side of the work, designing and building the website, along with creating and implementing their email and marketing campaigns, and related marketing materials.

16. Beyond his creative and marketing work for principal firm clients, Pesce was also centrally involved in Vertigo's strategic endeavors, such as:

     a.    *Acquisition of Digital Motion Web:* In 2011, Pesce was key to the negotiations and financial arrangements leading to Vertigo Media's acquisition of this firm, which expanded Vertigo Media's capabilities (and revenue generation) to web development and digital marketing.

     b.    *Podcast and new media development:* Pesce played a leading role in making Vertigo Media's podcast division functional, handling the technical and creative side of production.

     c.    *Client acquisitions:* While Pesce was key to securing many company clients, he also originated clients solely on his own.

     d.    *Operational responsibilities:* Pesce was integrally involved in management, budgeting, hiring and strategic business decisions.

17.    Pesce's role at Vertigo Media went far beyond creative execution.  He was a driving force in both the Company's growth and its day-to-day sustainability, directly responsible for bringing in new clients, executing major campaigns, and expanding the company's capabilities into digital realms, and crucially involved in its podcasting. Throughout his twenty years at Vertigo Media, Pesce fully dedicated his life to the Company — rarely taking vacations, almost never calling in sick, and routinely working through lunch at his desk.  He was always hands-on and deeply involved in both Vertigo Media s day-to-day business and work.

18.    Reflecting these facts, public and media coverage consistently identified Pesce as a co-managing partner and a co-owner of the marketing firm with Mirabile.  In July 2016, a Long Island Business News article entitled, "Vertigo Media Group in Growth Mode," described Pesce and Mirabile as partners and co-owners of the Company, detailing how they acquired Digital Motion Web and together expanded Vertigo Media's client base.  *See* https://libn.com/2016/07/12/vertigo-media-group-in-growth-mode/.    In 2022, philanthropic organization the EAC Network described Mirabile and Pesce as "partners and a very tight team to this day," in an announcement that Mirabile had joined EAC's board.  In 2023, Vertigo Media itself, announcing on Instagram its recognition as best advertising agency at the LI Choice Awards, credited "the dedication and hard work of our team, led by Fred Pesce and Lisa Mirabile:"

19.    Over the years, Vertigo expanded from a two-person startup to an established regional marketing agency with up to fourteen employees (plus several freelancers and contractors filling out the team as needed) and a roster of clients including some of the largest regional businesses on Long Island.

20.     By 2023, Vertigo was valued at approximately $1.3 million, making Pesce's equity interest alone valued at approximately $520,000.  Prior years had seen valuations at similar or even higher levels, and the firm was consistently a profitable and successful business.

21.     Even with its profitability and valuation, the company carried debt with the Small Business Administration (SBA) and Highpoint Funds totaling roughly $460,000-$480,000, which Pesce and Mirabile personally guaranteed.

**Mirabile Thwarted a Major Beneficial Transaction for Vertigo Media**

22.     During 2023 and 2024, Vertigo Media received overtures from a large firm in Connecticut about buying Vertigo Media.  There were months of due diligence and interviews between executives and personnel from the Connecticut company, and Mirabile and Pesce.

23.     In or about 2024, the Connecticut company proposed that, because Vertigo Media was experiencing certain financial stress at the time, instead of buying Vertigo Media outright, it would fund (or "consume") its staff salaries and benefits for a three-year period, while Vertigo Media paid down debt.  Thereafter, the Connecticut company would reconsider the terms of its purchase of Vertigo Media.

24.     The Connecticut company's offer to "consume" Vertigo Media was a real, bona fide offer.  Due diligence and negotiation progressed to the point where the Connecticut company and Mirabile and Pesce were negotiating specific salary figures and bonuses (and the clients they would apply to), as well as costs to be borne by the Connecticut company and Vertigo Media.

25.     Given the financial stress Vertigo Media was experiencing, Pesce believed this offer was advantageous for Vertigo Media's financial and future health, as well as for himself and Mirabile personally.  Mirabile, however, would have preferred a seven-figure outright purchase of Vertigo Media.

26.     Pesce was extensively involved in this process and dealings with the Connecticut company, participating in multiple meetings and interviews as the terms of a possible acquisition and subsequently of the possible "consumption" of Vertigo Media were hashed out in detail.

27.     However, toward the end of the discussions in or about May-June 2024, Mirabile excluded Pesce from meetings with the Connecticut company.  Ultimately, in or about June-July 2024, without discussing it with Pesce, Mirabile decided not to accept the Connecticut company's offer and rejected the deal, telling Pesce only after she had done so.

28.     As a result, Vertigo Media remained financially stressed.  During the spring and summer of 2024, Vertigo Media continued to experience financial shortfalls.  Twice during this period, Pesce did not receive his regular compensation, and twice he had to make significant advances (approximately $17,000) from his personal funds to Vertigo Media to cover the Company's payroll.

**Mirabile's Unlawful Ouster and Freeze-Out of Pesce**

29.     At various times during their many years working together, Pesce and Mirabile had occasional disagreements about aspects of Vertigo Media's business, and their different operating/management styles.

30.     During the spring and summer of 2024, tensions increased between them.  While Mirabile's personal life was creating added drama and stress in the office, Mirabile took the position that everything wrong with Vertigo Media was attributable to Pesce, blaming him for problems in client relationships –even though the clients were happy with Pesce's work – and disparaging and badmouthing him to Vertigo Media employees and contractors and to clients.

31.     Compounding the tensions, Vertigo Media's financial shortfalls continued during this period.

32.    On August 15, 2024, without warning, corporate  authorization, or grounds, Mirabile unilaterally and wrongfully terminated Pesce "as an officer and employee" of Vertigo Media in a letter to him.

33.    Pesce was blindsided and vehemently objected to his unlawful ouster, but Mirabile was undeterred and proceeded with her unilateral decision to eject Pesce, locking him out of the Company's server and email accounts, and ultimately freezing him out of the Company totally, refusing to provide him with any Company records, client materials, or financial information.

34.    Both at that time and thereafter, Mirabile has never provided any basis or justification for Pesce's purported termination and ouster.

35.    Following receipt of Mirabile's August 15, 2024, letter, Pesce repeatedly sought to discuss with Mirabile how to resolve the situation, i.e., their joint ownership of Vertigo Media, including how Vertigo Media's business assets and clients would be allocated among the two owners.

36.    Among other things, for example, on August 21, 2024, Pesce left a voicemail for Vertigo Media's bookkeeper Lori Massaro (now identified on Vertigo Marketing's website as that company's Chief Financial Officer), and on August 22, 2024 emailed her, confirming that he was still an officer and 40% owner of Vertigo Media, and requesting that she provide him with the Company's profit and loss statements for 2018-2022.  No one from Vertigo Media ever responded to Pesce's voicemail or email to the bookkeeper, and the requested profit and loss statements were never provided.

37.    Despite Pesce's repeated overtures to Mirabile regarding resolution of the dispute and an equitable division of Vertigo Media's business, including suggestions of specific clients

they would each retain (assuming the clients agreed), Mirabile flatly refused.  Ultimately in or about August or September  2024, in the face of Pesce's repeated efforts to resolve the situation, Mirabile and her then-boyfriend (who is now her husband, and who to Pesce's knowledge was not then and is not now a shareholder of Vertigo Media) retorted that if Pesce did not like being ousted, he should buy "them" out, and then went silent.

38.    Of course, Mirabile's and her boyfriend's demand was not a serious one, especially given that Mirabile had already frozen Pesce out from any access to the Company and its records, as described above.  And although the Vertigo Media shareholder agreement  (under which Mirabile and Pesce are also named as the Company's' officers and directors) contains numerous provisions governing a potential stock sale to an outsider and an involuntary transfer of a shareholder's stock, and provides for purchase of stock upon the termination of a shareholder's termination due to disability, and upon a shareholder's death, it makes no provision for the buyout of one shareholder simply upon demand of the other, or where one shareholder purports to oust the other from the Company.

39.    Upon information and belief, and unbeknownst to Pesce, even before ousting him, Mirabile was planning to take over Vertigo Media for herself and to try to erase Pesce from the Company history.  Shortly after wrongfully purporting to oust Pesce from the Company, Mirabile covertly formed a "new" marketing company — called "Vertigo Marketing Group" —  operating in the same industry, using the same "VMG" and "Vertigo" nicknames as Vertigo Media, servicing the same clients, and using the same marketing materials, confidential data, and creative work developed by Pesce and Vertigo Media.  Indeed, Vertigo Marketing's Google Business profile actually lists Vertigo Media Group, at Vertigo Marketing's (and previously Vertigo Media's) prior address in Bohemia, New York.

40.     Mirabile orchestrated Pesce's ouster as part of her coordinated plan to take Vertigo Media's clients and business for herself, while refusing to release distributions and other monies owed to Pesce but saddling him with liability for loans to the Company, and tax liability for the Company (without any financial distributions to offset the tax liabilities).  Indeed, Pesce has heard from several sources, including the president of a respected local networking group to which Pesce introduced Mirabile while they were still working together, that Mirabile regularly disparaged and badmouthed Pesce to other members of the group, and blamed Pesce for whatever disfunction she perceived at Vertigo Media.

41.     The name that Mirabile chose for her new firm — Vertigo Marketing Group — was a nearly duplicate copy of the name of the firm that she and Pesce had jointly operated for twenty years: Vertigo Media Group.

42.     Mirabile quite obviously selected the name to purposely trade off the "Vertigo" and "VMG" name and brand and thereby dupe Vertigo Media's clients into the belief that her new company was the same as the one she co-ran with Pesce, with the name change being simply a "rebranding" of Vertigo Media.

**Mirabile Denied Pesce's Requests for Vertigo Media's**
**Financial Information, While Saddling Him With Financial Liabilities**

43.     In or about August 2024, and at several subsequent times in 2024, Pesce requested from Mirabile, Vertigo Media's staff bookkeeper Lori Massaro, and Vertigo Media's outside accountant, Laura F. Millard, EA, of Precise Bookkeeping & Tax Services Inc., profit and loss statements and other financial statements for Vertigo Media.

44.     Defendant Mirabile, Ms. Massaro and Ms. Millard all ignored Mr. Pesce's requests.

45.     Upon information and belief, Defendant Mirabile directed and instructed Ms. Massaro and Ms. Millard to reject and disregard Mr. Pesce's requests for Vertigo Media's financial information.

46.     Upon further information and belief, Ms. Massaro and Ms. Millard followed Ms. Mirabile's instructions.

47.     On or about September 12, 2025, Mr. Pesce received from Ms. Millard's office a K-1 for calendar year 2024 attributing $79,362 in income to Mr. Pesce, based on and by virtue of his 40% ownership of stock in Vertigo Media.

48.     In the past, and at all relevant times while Pesce was actively working on behalf of Vertigo Media, Vertigo Media covered the taxes due from Pesce and upon information and belief from Mirabile on account of the Company's income, as part of their salaries, bonuses and/or distributions, by issuing payment directly to the taxing authority.

49.     However, Pesce has received no distribution of any kind from Vertigo Media for the taxes due on the income reflected in his 2024 K-1, which amounted to tens of thousands of dollars.

**Mirabile's and Vertigo Marketing's Unlawful Taking**
**Of Vertigo Media's Clients, Creative Intellectual Property and Employees**

50.     Under the guise of a "rebrand," Mirabile stole from Vertigo Media, which Pesce co-operated and owns with her, cutting him out and taking the Company's clients, employees, portfolio and creative property for herself, presenting them to the public as Vertigo Marketing's, clients, employees, portfolio and creative property, and effectively erasing any trace of Pesce.

51.     *Clients:* Vertigo Marketing's website, www.vertigogrp.com, to which Vertigo Media's website was redirected following Pesce's ouster, lists many clients developed and serviced by Vertigo Media under Pesce's tenure, including clients that he personally pitched,

developed, produced proposals for, and executed campaigns with.  Yet Mirabile and Vertigo Marketing have erased Pesce's name from the narrative, even removing him from customer testimonials, while falsely presenting the business as Mirabile's creation alone.

52.    *Employees:* Vertigo Marketing now reports on a staff of approximately nine (not all of whom are employees), at least five of whom were carried over directly from Vertigo Media Group

53.    *Portfolio:* Beyond the clients, Defendants took Vertigo Media's creative property— even Pesce's own personal creative works — and coopted them as their own.   For example, Vertigo Marketing's homepage prominently displays six "Highlighted Projects" as its creative and marketing work.  *See* https://vertigogrp.com/.  All of these were campaigns, websites, or photo shoots created under Pesce's leadership.

54.    Similarly, the other projects listed on Vertigo Marketing's "Our Work" page, https://vertigogrp.com/work/, are also projects for clients that Pesce led and worked on for Vertigo Media, which Pesce created himself or jointly developed.  This includes the branding, website design, advertising campaigns, and creative direction for nearly all of Vertigo's longstanding clients.  Defendants are unlawfully taking and using Pesce's and Vertigo Media's portfolio — including Pesce's intellectual and creative output spanning nearly two decades — to establish Vertigo Marketing Group's credibility and attract new clients.

55.    This is false, however, because Mirabile and Vertigo Marketing are holding these projects out as proof of their capabilities, but in actuality, the projects were conceived, executed, and delivered years earlier by Vertigo Media Group, in which Pesce was a 40% shareholder and active creative director. Each of the six marketing projects highlighted on Vertigo Marketing's

homepage was produced by Vertigo Media for its flagship clients, developed under Pesce's leadership.

56.    Even the opening sequence on Vertigo Marketing's webpage, which consists of a sequence of plays on the word "Vertigo" ("VertiGoals Accomplished," "VertiGoogle Rankings," "VertiGone Viral," "VertiGold Standard," "VertiGo For It," "VertiGo Beyond Limits") was actually conceived for Vertigo Media, although not implemented on Vertigo Media's website.

57.    *History:* Vertigo Marketing publicly markets itself as having over 20 years in business, notwithstanding that it was registered with the New York Secretary of State only a year ago in October 2024 – thus mispresenting the new entity as a direct continuation of the firm that Mirabile and Pesce operated together for nearly two decades.  *See, e.g.,* www.vertigogrp.com ("Over the past 20 years our clients have experienced tremendous success. We work with their goals in mind and put the proper plan in place to achieve them. As a matter of fact, we still work with our very first client. We are the keepers of the brand for our clients;" "With 20 years of success, at Vertigo, it's all about delivering exceptional work and ensuring client success.").

58.    *Public claims:*  In October 2025, Mirabile hosted a high-profile grand opening party for Vertigo Marketing at a new, upscale office space. The event was positioned not as the launch of a new venture but as the celebration of Vertigo Marketing's ongoing growth and long history. *See* https://vertigogrp.com/vertigo-marketing-group-opens-new-content-studio/.

59.    In addition, in recent blog posts, the company positions itself as the top Long Island marketing firm, and touts itself as a finalist for Long Island Business News Best Long Island Business award. For example, a July 31, 2025 Vertigo Marketing blog post is titled "Why Long Island Businesses Trust ***Vertigo Group*** for Results-Driven Campaigns" (emphasis added) – deliberately omitting "Marketing" from the company name, to further give the false impression to

readers (including consumers and existing and potential customers) that Vertigo Marketing Group is the same as Vertigo Media Group. *See https://vertigogrp.com/why-long-island-businesses-trust-vertigo-group-for-results-driven-campaigns/.*

60.    Similarly, Vertigo Marketing refers to itself as "Vertigo" or "VMG" close to ***one hundred times*** on its website – again, deliberately blurring any distinction between Vertigo Marketing and Vertigo Media.

61.    In short, Vertigo Marketing's publicly directed claims are stolen from the goodwill, history, and portfolio that Pesce helped create for Vertigo Media.

62.    By holding out Vertigo Marketing to be a mere continuation of Vertigo Media, and by representing Vertigo Media's projects and accomplishments and Vertigo Marketing's, Mirabile usurped corporate opportunities belonging to Vertigo Media, breached her fiduciary duties both to Pesce and Vertigo Media, and diverted corporate assets of Vertigo Media.

63.    Both Defendants are enriching themselves with and based on Pesce's and Vertigo Media's work and reputation – while erasing their names and existence.  Mirabile and Vertigo Marketing are taking and using the property, efforts, assets and goodwill built at Vertigo Media through Pesce's labor and equity, repackaging them as their property under the new "Vertigo Marketing" name, falsely portraying them as belonging to Mirabile and Vertigo Marketing, and monetizing them while cutting Pesce entirely out of recognition and compensation.

64.    At the same time, they are denying Pesce any share of the benefits of the business he helped to create but leaving him burdened with liability for Vertigo Media's outstanding loans, unpaid wages, and tax liability.

65.    Defendant Mirabile, by and through her position as President and majority controlling shareholder of Vertigo Media, has damaged Plaintiff Pesce by the following acts:

a.  causing Vertigo Media to assume debt from the U.S. Small Business Administration in or about 2020-2021 with a thirty-year term, and from Highpoint Funds during the same approximate period, and Plaintiff Pesce's personal guarantee therefor.  By ousting Pesce from Vertigo Media, Mirabile has effectively left him twisting in the wind, saddled with potential loan debt but unable to work for and earn money from the Company obligated on the loans.

b.  causing Vertigo Media to fail to fully repay Pesce for payroll advance in the approximate total amount of $17,000 that he made to Vertigo Media in or about the spring of 2024, within the last three to four months before Mirabile ousted him (while Mirabile occasionally advanced funds to the Company, she repaid herself promptly – unlike Pesce's advances to the Company, of which approximately $10,000 is still owed).

c.  causing Vertigo Media to fail to pay compensation to Pesce for services provided to the Company, in or about 2024.

d.  causing Vertigo Media to enter into a new lease at an increased cost of thousands of dollars over its existing lease, without notice to Pesce, and at a time when Vertigo Media owed Pesce thousands of dollars for Pesce's advances to the Company to cover payroll, and for compensation due to Pesce;

e.  upon information and belief, charging personal, non-business-related expenses on Vertigo Media's company credit and/or debit cards, and/or to Vertigo Media's corporate bank account(s);

17

f.      causing Vertigo Media to assign to Pesce the amount of over $79,000 in taxable income allocated via K-1, without any distributions to pay any of Vertigo Media's tax liabilities, including any related tax penalties or interest, whereas in the past, the Company distributed funds to Mirabile and to Pesce to cover tax liabilities.

## FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
(Asserted Derivatively on behalf of Vertigo Media Group Inc.
Against Defendant Mirabile)

66.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

67.    As majority shareholder, officer, and director of Vertigo Media, Defendant Mirabile owed fiduciary duties of loyalty, care, and good faith to Vertigo Media.

68.    Nominal defendant Vertigo Media is a closely held corporation formed under New York law.

69.    At all pertinent times herein, Plaintiff Pesce was and continues to be an owner of Vertigo Media.

70.    Plaintiff Pesce fairly represents the interests of the owners of Vertigo Media situated in enforcing the rights of Vertigo Media.

71.    At all pertinent times herein, Defendant Mirabile was and continues to be the President and controlling shareholder-owner of Vertigo Media.

72.    Defendant Mirabile, as the President, a director and the majority shareholder of Vertigo Media, owes fiduciary duties of care, undivided loyalty and utmost good faith, honesty and fairness, to the corporation, Vertigo Media.

73.     Defendant Mirabile has damaged and harmed the interests of Vertigo Media, as set forth above, including but not limited to, by:

a.      diverting clients, opportunities, and assets from Vertigo Media to Vertigo Marketing for her own benefit and the benefit of Vertigo Marketing, without authorization or due and fair consideration;

b.      wrongfully terminating and excluding Plaintiff Pesce from the business, operations, records, and clients of Vertigo Media;

c.      misusing Vertigo Media corporate property;

d.      usurping, preventing or terminating Vertigo Media's client and business relationships and using them for ongoing and future media and marketing services by Vertigo Marketing;

e.      adopting and using the confusingly similar name "Vertigo Marketing Group," and using the same acronym "VGM" and shortened name "Vertigo," to market the identical services to the same clients of Vertigo Media, thereby making false and misleading representations in commerce that are likely to cause confusion, mistake, or deception among clients, potential clients and the public as to Vertigo Marketing's affiliation, connection and association with Vertigo Media, and the origin, sponsorship and/or approval of Vertigo Marketing's services by Vertigo Media and/or Pesce; and

f.      competing with Vertigo Media by and through the business and activities conducted by Defendant's company, *to wit,* Vertigo Marketing.

74.    Upon information and belief, Defendant Mirabile caused Vertigo Media to terminate its contractual relationships with its clients by and through her capacity as the President and controlling shareholder of Vertigo Media and caused those relationships to be transferred to Vertigo Marketing.

75.    Defendant Mirabile caused Vertigo Media to engage in these acts and omissions to benefit herself, personally and individually, at the expense of and to the detriment of Vertigo Media and its owners, including Pesce.

76.    Defendant Mirabile caused Vertigo Media to engage in these acts and omissions to benefit other companies and entities that she owns and/or has a financial or beneficial interest in, including the company known as "Vertigo Marketing," at the expense and to the detriment of Vertigo Media and its owners, including Pesce.

77.    Defendant Mirabile breached her fiduciary duties of care, undivided loyalty and utmost good faith, honesty and fairness to, and to the detriment of, Vertigo Media and its owners, including Pesce.

78.    Defendant Mirabile continues to breach her fiduciary duties of care, undivided loyalty and utmost good faith, honesty and fairness to Vertigo Media and its owners, including Pesce.

79.    As a direct and proximate result of Defendant Mirabile's conduct and breaches, Vertigo Media has incurred substantial damages and will continue to incur ongoing substantial damages.

80.    As a result, Vertigo Media has suffered damages in an amount to be determined at trial.

81.     As demonstrated by the particularized facts alleged herein, Defendant Mirabile faces a substantial threat of personal liability, based on her mismanagement, waste, misappropriation, breaches of contract, and breaches of fiduciary duties that she has committed and is continuing to commit, which have significantly and substantially harmed Vertigo Media and, therefore, rendered Vertigo Media and Defendant Mirabile incapable of impartially considering whether Vertigo Media should assert its legal rights against her.

82.     Defendant Mirabile has actual and *de facto* control over Vertigo Media and the other Vertigo Media owners, who would otherwise be able to provide assistance to Plaintiff Pesce and prosecute the claims set forth herein on behalf of Vertigo Media against Defendant Mirabile.

83.     Based on the foregoing, making a pre-suit demand to and upon nominal defendant Vertigo Media to prosecute the claims set forth herein against Defendant Mirabile would be futile.

84.     By her actions and failures to act, Defendant Mirabile has breached her fiduciary duties to Plaintiff Pesce and Vertigo Media.

85.     As a result, Plaintiff Pesce and Vertigo Media have suffered damages, including loss of profits, goodwill, and shareholder value.

86.     Accordingly, Plaintiff Pesce on behalf of Vertigo Media is entitled to compensatory and punitive damages, together with an accounting and disgorgement of profits in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
(Asserted Directly by Pesce Against Defendant Mirabile)

87.     Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

88.     As majority shareholder, officer, and director of Vertigo Media, Defendant Mirabile owed fiduciary duties of loyalty, care, and good faith to Pesce as minority shareholder.

89.     Nominal defendant Vertigo Media is a closely held corporation formed under New York law.

90.     At all pertinent times herein, Plaintiff Pesce was and continues to be an owner of Vertigo Media.

91.     Defendant Mirabile, as the President, a director and the majority shareholder of Vertigo Media, owes fiduciary duties of care, undivided loyalty and utmost good faith, honesty and fairness, to Plaintiff Pesce, an officer, director and the minority shareholder of Vertigo Media.

92.     Defendant Mirabile has damaged and harmed the interests of Pesce, as set forth above, including but not limited to, by:

   a.   inducing and/or taking advantage of Pesce's advancement of funds to Vertigo Media for payroll expenses in 2024 shortly before purporting to oust him from the Company, and refusing to repay the funds advanced by Pesce;

   b.   failing to pay Pesce compensation due to him in 2024 on account of services he provided to Vertigo Media, ousting him from the Company shortly after payment was due, and thereafter refusing to address the Company's obligations to him; and

   c.   causing Vertigo Media to allocate to Pesce over $79,000 business income for 2024, without any corresponding distributions to cover Pesce's tax liability for Vertigo Media's income;

d.    wrongfully and in bad faith terminating and excluding Plaintiff Pesce from the business, operations, records, and clients of Vertigo Media;

e.    wrongfully and in bad faith purporting to oust Plaintiff from his position as Executive Vice President and Creative Director of Vertigo Media;

f.    denying Pesce any share of the benefits of the business he helped to create, but leaving him burdened with liability for Vertigo Media's outstanding loans, unpaid wages, and tax liability;

g.    wrongfully and in bad faith refusing to negotiate with Pesce regarding a division of Vertigo Media's business, or other resolution of the situation that Mirabile created when she purported to oust Pesce from Vertigo Media.

93.    Defendant Mirabile engaged in these acts and omissions to benefit herself, personally and individually, at the expense of and to the detriment of Pesce.

94.    Defendant Mirabile engaged in these acts and omissions to benefit other companies and entities that she owns and/or has a financial or beneficial interest in, including the company known as "Vertigo Marketing," at the expense and to the detriment of Pesce.

95.    By her actions and failures to act, Defendant Mirabile breached and continues to breach her fiduciary duties of care, undivided loyalty and utmost good faith, honesty and fairness to, and to the detriment of, Pesce.

96.    As a direct and proximate result of Defendant Mirabile's conduct and breaches, Pesce has incurred substantial damages and will continue to incur ongoing substantial damages.

97.    Accordingly, Plaintiff Pesce is entitled to compensatory and punitive damages, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### USURPATION OF CORPORATE OPPORTUNITY
(Asserted Derivatively on behalf of Vertigo Media Group Inc. against Defendant Mirabile and Vertigo Marketing Group LLC)

98.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

99.    The opportunities to provide marketing services to clients serviced by Vertigo Media, including without limitation Merola Tile, ADR Law, Giunta's Meat Farms, PW Grosser Consulting, Briscoe Protective, The Advance Group, American Society on Aging, Fatfish on the Water, and Bristol Pay/Get Payably, belonged to Vertigo Media.

100.    Defendant Mirabile, while a fiduciary to Vertigo Media, appropriated those opportunities, for her personal gain and the benefit of Vertigo Marketing, for and to Defendant Vertigo Marketing and herself.

101.    Defendant Mirabile's conduct constitutes a wrongful usurpation of corporate opportunity and breach of loyalty to Vertigo Media and its shareholders, including Pesce.

102.    Accordingly, Vertigo Media is entitled to a disgorgement of all profits realized from those opportunities diverted to Defendants Mirabile and Vertigo Marketing, and to the imposition of constructive trust over such profits, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### DISSOLUTION BASED ON SHAREHOLDER OPPRESSION (NY BCL § 1104-a)
(Asserted Directly by Plaintiff Pesce against Defendant Mirabile)

103.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

104.    Pursuant to NY BCL § 1104-a, a holder of shares representing twenty percent or more of the votes of all outstanding shares of a corporation is entitled to seek a dissolution of the

corporation, if those in control of the corporation have engaged in "illegal, fraudulent, or oppressive actions toward the complaining shareholders" or the "property or assets of the corporation are being looted, wasted, or diverted for non-corporate purposes by its directors, officers or those in control of the corporation." *See* BCL § 1104-a (1)(2).

105.    Plaintiff Pesce holds forty percent (40%) of the votes of all the outstanding shares of Vertigo Media, and he held this percentage of shares at all relevant times.

106.    Defendant Mirabile holds sixty percent (60%) of the votes of all the outstanding shares of Vertigo Media, and she held such percentage of shares at all relevant times.

107.    Defendant Mirabile's conduct toward Pesce — including without limitation excluding Plaintiff Pesce from Vertigo Media's management, denial of Pesce's access to Vertigo Media's records, and diversion of Vertigo Media's clients, creative property, name, brand, and other assets — satisfies BCL § 1104-a in that it is among the conduct prohibited under § 1104-a.

108.    Accordingly, Plaintiff Pesce is entitled to an order judicial dissolution of Vertigo Media, or in the alternative, a Court-ordered and judicially supervised sale of his 40% interest in Vertigo Media at fair value, pursuant to New York Business Corporation Law.

### FIFTH CAUSE OF ACTION

**UNJUST ENRICHMENT**
(Asserted  Derivatively on behalf of Vertigo Media Group Inc. against Defendant Mirabile and Defendant Vertigo Marketing Group LLC)

109.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

110.    By adopting and using the confusingly similar name "Vertigo Marketing Group" and using the same acronym "VMG" and shortened name "Vertigo" to market the identical services to the same clients of Vertigo Media, Vertigo Marketing and Mirabile have

misrepresented to clients and potential clients of Vertigo Media and Vertigo Marketing that the two companies are the same, such that those clients, potential clients and the public are likely to be confused or deceived as to Vertigo Marketing's affiliation, connection and association with Vertigo Media, and as to the approval of Vertigo Marketing's services by Vertigo Media and/or Pesce.

111.    Defendants Mirabile and Vertigo Marketing have taken for themselves and received the benefits of Vertigo Media's business and assets, including without limitation its creative output, clients, accounts, funds, profits, distributions, and other forms of monies and compensation owed to Vertigo Media, for which it has not been paid and/or for which it has not been compensated.

112.    Defendants Mirabile and Vertigo Marketing have been unjustly enriched by those benefits to the detriment of Vertigo Media.

113.    It is against equity and good conscience for Defendants to be enriched and retain those benefits and amounts without due compensation to Vertigo Media.

114.    Accordingly, Vertigo Media is entitled to damages from defendants Mirabile and Vertigo Marketing in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### UNJUST ENRICHMENT
(Asserted Directly by Plaintiff Pesce Against Defendant Mirabile and Defendant Vertigo Marketing Group LLC)

115.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

116.    Defendants Mirabile and Vertigo Marketing have taken for themselves and received the benefits of Plaintiff' Pesce's work, knowledge and efforts, including without

limitation his creative output, loan guarantees, commissions, profits, distributions, and other forms of monies and compensation owed to him, but for which he has not been paid and/or for which he has not been compensated.

117.    Defendants Mirabile and Vertigo Marketing have been unjustly enriched by those benefits to the detriment of Plaintiff Pesce.

118.    It is against equity and good conscience for Defendants to be enriched and retain those benefits and amounts without due compensation to Plaintiff Pesce.

119.    Accordingly, Plaintiff Pesce is entitled to damages from defendants Mirabile and Vertigo Marketing in an amount to be determined at trial

## SEVENTH CAUSE OF ACTION

### CONVERSION
(Asserted Derivatively against Defendant Mirabile and Defendant Vertigo Marketing LLC)

120.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

121.    At all relevant times, Vertigo Media had and has a possessory interest in its assets and business property, including without limitation its client lists, confidential data, creative materials, and intellectual property, to compete with, take over and destroy Vertigo Media's business.

122.    Defendants Mirabile and Vertigo Marketing have exercised dominion and control over and wrongfully taken and used for their own benefit, Vertigo Media's assets and business property, including without limitation Vertigo Media's client lists, confidential data, creative materials, and intellectual property, to the exclusion of Vertigo Media and in derogation of Vertigo Media's rights.

123.    The actions of Defendant Mirabile and Defendant Vertigo Marketing in derogation of Vertigo Media's rights, were undertaken to compete with, take over and destroy Vertigo Media's business, and conduct constitutes conversion of corporate property.

124.    As a result, Plaintiff Pesce on behalf of Vertigo Media seeks damages and restitution of all property and profits so converted and a permanent injunction restraining Defendants from using Vertigo Media's assets and business property, including without limitation its client lists, confidential data, creative materials, and company goodwill, and from doing business with Vertigo Media's clients.

## EIGHTH CAUSE OF ACTION

### CONVERSION
(Asserted Directly by Plaintiff Pesce against Defendant Mirabile)

125.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

126.    At all relevant times, Plaintiff Pesce had and has a possessory interest in personal funds which he loaned to Vertigo Media for payroll expenses, of which approximately $10,000 remains unpaid and owing to Pesce.

127.    At all relevant times, Plaintiff Pesce had and has a possessory interest in compensation owed to him for services he provided to Vertigo Media, including without limitation compensation accrued but unpaid for at least two periods in 2024.

128.    At all relevant times, Plaintiff Pesce had and has a possessory interest in compensation and/or other payments owed to him by Vertigo Media to cover taxes on Vertigo Media income attributed to Pesce.

129.    Since at least August 2024, Mirabile has exercised dominion and control over all of Vertigo Media's financial accounts and records, has refused to allow Pesce to access those

records, and has ignored his requests for financial information and records relating to Vertigo Media.

130.    Defendant Mirabile exercised dominion over and wrongfully took and has refused to repay, or to cause Vertigo Media or Vertigo Marketing to pay, to Pesce funds which Pesce advanced for Vertigo Media's payroll expenses; compensation owed to Pesce for services provided to Vertigo Media; and payment owed to Pesce to cover taxes on Vertigo Media income attributed to Pesce, all in derogation of Pesce's rights.

131.    As a result of Mirabile's actions, Plaintiff Pesce seeks damages and restitution of all property and profits so converted.

## NINTH CAUSE OF ACTION

### ACCOUNTING AND CONSTRUCTIVE TRUST
(Asserted Derivatively against Defendant Mirabile)

132.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

133.    As controlling shareholder/owner and officer of Vertigo Media, Defendant Mirabile has exclusive control over corporate accounts of Vertigo Media and must render full accounting under NY BCL §§ 624 and 720.

134.    As the controlling shareholder, director and officer of Vertigo Media, Defendant Mirabile owes fiduciary duties of trust, honesty and loyalty to Vertigo Media and Plaintiff Pesce.

135.    Defendant Mirabile's conduct as alleged herein constitutes conversion of corporate property and unfair competition.

136.    Equity requires that a constructive trust be imposed for the benefit of Vertigo Media and Plaintiff Pesce, over all the revenues and assets derived from the business diverted by Mirabile and Vertigo Marketing from Vertigo Media.

137.    Accordingly, Plaintiff Pesce seeks an accounting and constructive trust.

**TENTH CAUSE OF ACTION**

**COMMON LAW UNFAIR COMPETITION AND PASSING OFF**
(Asserted Derivatively against Defendants
Mirabile and Vertigo Marketing Group LLC)

138.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

139.    Since its founding in 2004, Vertigo Media has continuously used the names "Vertigo," "Vertigo Media Group" and "VMG" in commerce in connection with marketing, branding, advertising, design, and creative services.

140.    Through nearly two decades of continuous use, Vertigo Media's name has acquired substantial goodwill, distinctiveness, and recognition among clients and within the Long Island and New York regional marketing industry

141.    That goodwill and public association were built through the joint efforts of Plaintiff Pesce and Defendant Mirabile, including high-profile projects and campaigns for clients such as Merola Tile, Gurwin Healthcare, PW Grosser Consulting, and The Advance Group.

142.    On or about the time that Defendant Mirabile unlawfully and wrongfully ousted Plaintiff Pesce in 2024, Defendant Mirabile formed Vertigo Marketing Group LLC (defined above as "Vertigo Marketing"), a new corporation operating in the same line of business, using the same staff, serving the same clients, and publicly holding itself out falsely as a mere rebranded continuation of Vertigo Media -- that is, falsely portraying itself and/or creating the belief in others that the two companies are the same company.

143.    Vertigo Marketing's name is confusingly similar to "Vertigo Media Group," differing only in the substitution of the generic word "Marketing" for "Media." The names sound

identical, convey the same meaning, and refer to identical services. Vertigo Marketing also refers to itself as "Vertigo" and "VMG," as Vertigo Media did, including without limitation throughout Vertigo Marketing's website.

144.    By adopting and using the confusingly similar name "Vertigo Marketing Group" and using the same acronym "VMG" and shortened name "Vertigo" to market the identical services to the same clients of Vertigo Media, Vertigo Marketing and Mirabile have misrepresented to clients and potential clients of Vertigo Media and Vertigo Marketing that the two companies are the same, such that those clients, potential clients and the public are likely to be confused or deceived as to Vertigo Marketing's affiliation, connection and association with Vertigo Media, and as to the approval of Vertigo Marketing's services by Vertigo Media and/or Pesce

145.    Defendants' conduct has been and is willful and intentional, thereby undertaken with full knowledge of Vertigo Media's prior use of "Vertigo," "Vertigo Media," "VMG" and the "Vertigo Media Group" name and of Vertigo Media's reputation, and with the purpose of causing confusion among existing and potential clients and the general public as to the source, sponsorship, and/or affiliation of Defendants' Vertigo Marketing business.

146.    Indeed, Vertigo's clients and third parties have expressed confusion, contacting Plaintiff under the belief that Vertigo Marketing Group was simply a rebranding or continuation of Vertigo Media Group.

147.    Defendants' acts constitute common law unfair competition and passing off, including misappropriation of Vertigo Media's name, goodwill, reputation, and proprietary creative portfolio for Defendants' benefit.

148.    As a direct and proximate result, Vertigo Media has suffered loss of goodwill, client confusion, and diversion of business and profits to Defendants.

149.    Accordingly, Plaintiffs Pesce on behalf of Vertigo Media is entitled to injunctive relief, disgorgement of profits, and compensatory and punitive damages as determined at trial.

## ELEVENTH CAUSE OF ACTION

### FALSE DESIGNATION OF ORIGIN
### PURSUANT TO THE LANHAM ACT §43(a), 15 U.S.C. §1125(a)
(Asserted Derivatively against Defendants
Mirabile and Vertigo Marketing Group LLC)

150.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

151.    Vertigo Media's name and trade identity "Vertigo," "Vertigo Media," and "Vertigo Media Group" and the acronym "VMG" are distinctive identifiers of source and origin for marketing, branding, and creative services and deliverable products, including but not limited to client logos and brand identities, websites, and advertising and marketing materials.

152.    Vertigo Media's marketing, branding and creative services and deliverables have been advertised, offered, and provided through interstate commerce, including without limitation through Vertigo Media's website, and to clients and prospective clients throughout the United States, such as Moe's Southwest Grill, Merola Tile, and the American Society on Aging.

153.    By adopting and using the confusingly similar name "Vertigo Marketing Group" and using the same acronym "VMG" to market the identical services to the same clients of Vertigo Media, Defendants Vertigo Marketing and Mirabile have made and are making false and misleading representations in commerce that are likely to cause confusion, mistake, or deception as to:

(a)    the affiliation, connection, association of Defendant Vertigo Marketing with Vertigo Media; and

(b)    the origin, sponsorship, and/or approval of Defendant Vertigo Marketing's goods and services by Vertigo Media and/or Pesce.

154.    In adopting and using the confusingly similar name "Vertigo Marketing Group," "Vertigo Marketing," "VMG" and "Vertigo" for services identical to and/or of the same type and nature as those provided by Vertigo Media, and in advertising and presenting itself to the public, including Vertigo Media customers and other prospective customers, Defendants Mirabile's and Vertigo Marketing's public statements, advertising, and website — including claims of "20 years" in business, and "20 years of success," promotional podcasts, and the display of creative projects designed and executed by Plaintiff while at Vertigo Media — further misrepresent Defendants' business as the successor or continuation of Vertigo Media Group.

155.    Defendants have acted and continued to act willfully and with the intent to mislead, deceive and dupe Vertigo Media's customers, and Vertigo Marketing's current, newly retained and future clients, into the belief that Vertigo Marketing Group is the same entity as, and/or the successor or continuation of, Vertigo Media Group.

156.    Defendants have actually and in fact misled, deceived and duped such clients and prospective clients and consumers into the belief that Vertigo Marketing Group is the same entity as, and/or the successor or continuation of, Vertigo Media Group, and thus that Vertigo Marketing's services come from Vertigo Media.

157.    Defendants' acts constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

158.    Defendants have acted and continue to act willfully and with intent to trade on Vertigo Media's established reputation, goodwill, and creative achievements.

159.    As a result of Defendants' actions, Vertigo Media has suffered and will continue to suffer irreparable harm, including loss of control over its reputation and the diversion of clients and business opportunities to Vertigo Marketing.

160.    As a proximate result of all of the foregoing, Plaintiff Pesce on behalf of Vertigo Media is entitled to injunctive relief under 15 U.S.C. §1116, recovery of Defendants' profits, actual and statutory damages, treble damages for willful infringement under 15 U.S.C. §1117, and reasonable attorneys' fees.

## TWELFTH CAUSE OF ACTION

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECS. 133 AND 360-L**
(Asserted Derivatively against Defendants
Mirabile and Vertigo Marketing Group, Inc.)

161.    Plaintiff incorporates and reasserts all prior allegations contained in the foregoing paragraphs as if set forth fully herein.

162.    Defendants' adoption and use of the confusingly similar business names "Vertigo Marketing Group," "Vertigo Marketing," "Vertigo" and "VMG" violates GBL §133, which prohibits the use of a corporate, trade, or business name "with intent to deceive or mislead the public" or to create the false impression of connection with another established business.

163.    Defendants' conduct — including their representation that Vertigo Marketing Group has operated for "20 years," their continued use of Vertigo Media Group's creative portfolio, and their solicitation of Vertigo Media's clients — demonstrates an intent to deceive and to misappropriate Vertigo Media's identity.

164.     By adopting and using the confusingly similar name "Vertigo Marketing Group" and using the same acronym "VMG" and shortened name "Vertigo" to market the identical services to the same clients of Vertigo Media, Vertigo Marketing and Mirabile have misrepresented to clients and potential clients of Vertigo Media and Vertigo Marketing that the two companies are the same, such that those clients, potential clients and the public have been and are likely to be confused or deceived as to Vertigo Marketing's affiliation, connection and association with Vertigo Media, and as to the approval of Vertigo Marketing's services by Vertigo Media and/or Pesce

165.     Defendants' use of the Vertigo name also violates GBL §360-l, which protects the distinctive quality and reputation of established trade names and prohibits dilution of such marks through confusingly similar use, even absent proof of direct competition or confusion.

166.     Defendants' use of the company acronym "VMG" also violates GBL §360-l, which protects the distinctive quality and reputation of established trade names and prohibits dilution of such marks through confusingly similar use, even absent proof of direct competition or confusion.

167.     Defendants' actions have caused and will continue to cause dilution and injury to Vertigo Media's business reputation, loss of goodwill, and the blurring of Vertigo Media's distinctive trade identity.

168.     Pursuant to GBL §§133 and 360-l, Plaintiffs Pesce and Vertigo are entitled to a permanent injunction restraining Defendants from using "Vertigo," "VMG," "Vertigo Group," or any confusingly similar name in connection with marketing, creative, or advertising services, and to recovery of damages, profits, and attorneys' fees as allowed by law.

**WHEREFORE**, Plaintiff Pesce demands judgment as follows:

A.     On the First Cause of Action, damages in an amount to be determined at trial but no less than $1,500,000;

B.     On the Second Cause of Action, damages in an amount to be determined at trial but no less than $1,500,000;

C.     On the Third Cause of Action, damages in an amount to be determined at trial;

D.     On the Fourth Cause of Action, adjudging Defendants' actions oppressive under BCL § 1104-a and granting judicial dissolution of Vertigo Marketing Group LLC, or alternatively compelling a buyout of Pesce's 40% shares of Vertigo Media Group Inc. at fair value of Vertigo Media Group Inc. under BCL § 1118, together with interest;

E.     On the Fifth Cause of Action, damages in an amount to be determined at trial but no less than $1,500,000;

F.     On the Sixth Cause of Action, damages in an amount to be determined at trial but no less than $1,500,000;

G.     On the Seventh Cause of Action, damages in an amount to be determined at trial but no less than $1,500,000, and a permanent injunction restraining Defendants form using Vertigo's client data and company goodwill and from doing business with Vertigo Media's clients;

H.     On the Eighth Cause of Action, damages in an amount to be determined at trial;

I.     On the Ninth Cause of Action, a constructive trust in an amount to be determined at trial but no less than $1,500,000;

J.     On the Tenth Cause of Action, (i) declaring that Defendants' use of the name Vertigo Marketing Group constitutes common-law unfair competition and passing off under New

York law; (ii) issuing a permanent injunction prohibiting Defendants from using the name "Vertigo," "Vertigo Marketing Group," "VMG," or any confusingly similar name in connection with marketing or creative services; and (iii) awarding profits, actual damages, punitive damages, plus attorneys' fees and costs under New York law.

K.    On the Eleventh Cause of Action, (i) declaring that Defendants' use of the name Vertigo Marketing Group constitutes false designation of origin and unfair competition under Lanham Act § 43(a), 15 U.S.C. §1125(a); (ii) issuing a permanent injunction prohibiting Defendants from using the name "Vertigo," "Vertigo Marketing Group," "VMG," or any confusingly similar name in connection with marketing or creative services; and (iii) awarding profits, actual damages, and treble damages for willful infringement, plus attorneys' fees and costs under the Lanham Act and New York law;

L.    On the Twelfth Cause of Action, (i) declaring that Defendants' use of the name Vertigo Marketing Group violates New York General Business Law §§133 and 360-l; (ii) issuing a permanent injunction prohibiting Defendants from using the name "Vertigo," "Vertigo Marketing Group," or any confusingly similar name in connection with marketing or creative services; and (iii) awarding profits, actual damages, and treble damages for willful infringement, plus attorneys' fees and costs under New York law;

M.    Awarding Plaintiff costs, disbursements and attorneys' fees;

N.    Statutory interest; and

O.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Please take notice that demand is hereby made for a trial by jury on all issues so triable.

Dated: New York, New York
       November 13, 2025

**MAZZOLA LINDSTROM LLP**

*/s/    Stephen L. Brodsky*
       Stephen L. Brodsky
       Laura D. Castner
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
(646) 216-8300
stephen@mazzolalindstrom.com
laura@mazzalindstrom.com

*Attorneys for Plaintiff Fred Pesce,*
*Individually and on behalf of*
*Vertigo Media Group Inc.*